[Civ. No. 20389.  Second Dist., Div. Two.  Feb. 25, 1955.]

F. W. HICKS et al., Appellants, v. WHELAN DRUG COMPANY, INC. (a Corporation) et al., Respondents.

C. P. Van Herzen, Samuel L. Laidig and Julius A. Leetham for Appellants.

Desser, Rau & Hoffman, and William Christensen for Respondents.

McCOMB, J.—From a judgment in favor of plaintiffs in an action for an injunction, declaratory relief and damages against a lessee for breach of a lease, plaintiffs appeal, urging that the relief granted by the trial court was inadequate and not all that they sought.

*Facts:** Prior to March 5, 1941, H. B. Garfield was the owner of and engaged in the business of operating a chain of drugstores in the county of Los Angeles under the fictitious firm name of Mid-City Drug Stores.

On March 5, 1941, Mr. Garfield and his wife, as lessees and appellants, F. W. Hicks and Bernice Ann Hicks, as lessors, executed a lease covering premises in the city of Glendale, together with the appurtances, improvements, fixtures and equipment to be installed thereon, which contained, among others the following provisions:

"Use of premises: It is understood and agreed that the demised premises shall be used by the Lessee for the purpose of conducting thereupon a general drug store business, including the sale of not only pharmaceutical supplies and pre-

---

*The evidence is viewed in the light most favorable to defendant (respondent) pursuant to the rule set forth in *Estate of Isenberg,* 63 Cal. App.2d 214, 216 [2] [146 P.2d 424].

scriptions, patent and other medicines and drugs, but also the sale and dispensing of ice cream, groceries, cigarettes and tobaccos, toilet articles, cosmetics, hair tonics, perfumes, hosiery, household needs, auto supplies and parts, and such other articles as might from time to time be sold or used by beauty parlors or barber shops, and also the sale of sporting goods, photographic equipment and supplies, magazines, stationery, rubber goods, bristle goods, clocks, druggist sundries, radio and television equipment and supplies, beers, wines, liquors and all legal alcoholic beverages, prepared food and *the privilege* of operating a restaurant, fountain and beauty parlor, and all other items and products which are, or may in the future be generally handled, sold or dispensed in super drug stores within the County of Los Angeles. Lessor agrees that he will not lease or let or permit to be occupied any or all of the remaining stores in the building of which the demised premises are a part, for a general drug store or fountain or restaurant or liquor business.

"Lessee further covenants and agrees that he will not allow said premises to be used for any purpose that will increase the rate of insurance thereon, or keep thereon any gasoline, distillate, or any kind of petroleum product for use in heating, lighting or other purpose, except the handling of such items of like kind as are usually handled in super drug stores. Lessee will not permit said premises to be used for any unlawful purpose that will injure the reputation of the same or of the building of which they are a part, or disturb the tenants of such building or the neighborhood, and that he will not permit the same to remain vacant or unoccupied at any time after the initial entry and occupation thereof, except insofar as such vacancy shall be necessitated or occasioned by the making of any improvement, alterations, replacements or repairs duly consented to by the Lessor. It is contemplated, however, that the Lessor will grant his consent to proper and necessary remodeling and redecoration of the demised premises." (Italics added.)

Contemporary with the execution of the lease the parties executed a supplemental agreement modifying the rental fixed in the lease. Plaintiffs completed the building which they were required to erect on said premises by the terms of the lease and the lessees went into possession and commenced the operation of a retail drugstore on or about July 10, 1941.

Thereafter, on or about January 23, 1942, H. B. Garfield and his wife assigned all their right, title and interest

in and to the leased premises and the lease to the Mid-City Drug Stores, a California corporation which entered into possession of the premises on or about said date and continued the operation of a retail drugstore thereon.

On or about September 23, 1946, the corporation assigned the above mentioned lease, together with the drugstore located on the premises, and its stock to defendants. About September 1, 1949, the soda fountain which had been operated in the drugstore was closed and the portion of the store which had been used for such purposes was enclosed by a paneled partition.

On December 12, 1951, plaintiffs filed the present action setting up· the lease, the subsequent assignment and acceptance by defendants, and asking for declaratory relief, an injunction and damages for breach of the lease. In substance plaintiffs alleged as follows:

"1. That the lease, which was for drug store premises, to be operated in the character and style of comparable super drug stores within the County of Los Angeles, included a fully equipped drug store, luncheon counter, and soda fountain. That, specifically, the luncheon counter and soda fountain fixtures and equipment (although paid for by the lessors) were selected by the lessee and installed under the lessee's direction.

"2. The rental on the premises was on the basis of a specified minimum rental, in addition to which a certain percentage was payable on a gross sales basis after a specified gross sales figure per year was reached.

"3.· After the respondents Whelan took possession of the premises, they permitted the stock, merchandising policies, and personnel to deteriorate, and permitted the premises itself to 'fall apart.'

"4. Deprived the plaintiff-appellants of certain anticipated profits under their lease."

The trial court found, (1) that if the soda fountain were reopened and properly operated such operation would increase the gross volume of sales but not to a point where there would be any overage payable under the terms of the lease as amended; (2) that if the portion of the premises presently unoccupied and walled off were used for display of merchandise or for some other related purpose in the conduct of the drugstore on the premises such use would augment gross sales, but not to the point where any overage payments would become due under the percentage terms of

the lease as amended; (3) that there has not been any loss of percentage rentals above the minimum figure provided for in the lease as amended due to the action of defendants; (4) that gross sales in the store have declined materially since September, 1946; that the decline is attributable to many factors, but cannot be attributed solely to the manner in which defendants have operated the premises, and (5) that the closing of the fountain and grill in the drugstore did not constitute a breach of the lease.

Judgment was rendered in favor of plaintiffs, decreeing that defendants had not maintained the property in accordance with the terms of the lease and ordering defendants to paint the exterior signs, place them in good working order and appearance, replace all broken or damaged plate glass, repair venetian blinds, and place the exterior of the building, with the exception of the walls, in first class condition and to so maintain it, and ordered defendants to pay the attorneys for plaintiff $500 as attorneys' fees and awarded plaintiffs costs.

*Questions*: First: *Was there substantial evidence to sustain the findings of the trial court set forth above?*

*Yes.* ■ The language of the agreement between the parties was clear and explicit. Therefore under the provisions of the Civil Code, sections 1638-1641* and *Masciotra v. Harlow*, 105 Cal.App.2d 376, 379 [233 P.2d 586], the terms of the agreement being clear, definite and certain, the language of the instrument governed, and the trial court properly did not take into consideration extraneous evidence in construing the meaning of the contract.

■ A licensed real estate broker specializing in business and commercial properties for about 29 years testified that the premises were wholly unsuited for a drugstore operation, and during the four or five years prior and up to the time of the trial, the trend of growth in Glendale and retail merchants was going in a northerly direction on Brand

---

*These sections read:

"§ 1638. The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.

"§ 1639. When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this title.

"§ 1640. When, through fraud, mistake, or accident, a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded.

"§ 1641. The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."

Boulevard, with the consequence that there was no foot traffic at or about the demised premises, and that in his opinion the fact that about one half of the store was walled off would have absolutely no effect upon the sales in the store.

Mr. H. B. Garfield testified as an expert in that he had been working in drugstores since 13 years of age; had been operating his own drugstore since 1928; had a chain of 13 drugstores which he owned, and had been a member of the State Board of Pharmacy for 12 years prior to the time of trial. He testified that the method of operation during the period of time he operated it was that of a super drugstore and that the partitioning off of the space formerly occupied by the soda fountain so as to conceal it from the view of persons entering the store was, in his opinion, a good practice; that there was sufficient inventory carried, and they used all the space reasonably necessary for the conduct of a drugstore in accordance with the terms of the lease. Mr. Garfield, who had operated the soda fountain for a period of time, testified that he had closed it on several occasions, had subleased the fountain to several concessionaires who were unable to operate it at a profit, and that the effect of the operation of the soda fountain on the total gross sales of the store was negligible.

In addition the trial judge viewed the premises. This "view" of the store was independent evidence which could be considered by the trier of fact in arriving at his conclusions and is substantial evidence in support of his findings, consonant therewith. (*Saks & Co.* v. *City of Beverly Hills,* 107 Cal.App.2d 260, 266 [5-6] [237 P.2d 32], hearing denied by the Supreme Court; *Rowland* v. *City of Pomona,* 82 Cal. App.2d 622, 624 [1] [186 P.2d 447].)

The foregoing evidence clearly supports each of the questioned findings. Further discussion of the evidence would serve no useful purpose.

The observation of Mr. Justice Hansen in *Achen* v. *Pepsi-Cola Bottling Co.,* 105 Cal.App.2d 113, 125 [6] [233 P.2d 74], hearing denied by the Supreme Court, is here apposite:

"We sit as a court to review errors of law and not errors of fact. Accordingly, we are perplexed to understand just why appellants throughout their briefs and argument constantly refer to the fact that the trial judge should on the evidence presented to him have found the facts contrary to the findings he made. If we were to conclude he erred in

every finding he made on contradictory evidence we would still be completely helpless to reverse him on that account. The rule is too well established to require the citation of precedents."

■ Second: *Did the closing of the soda fountain and grill constitute a breach of the lease?*

*No.* Paragraph V of the lease expressly gave the lessees "the privilege" of operating a restaurant, fountain and beauty parlor. The word "privilege" is defined in Webster's New International Dictionary (1939), 2d ed., volume 2, page 1969, thus: "1. A right or immunity granted as a peculiar benefit, advantage or favor; . . . 2. A grant of a special right or immunity; a franchise or patent; as, a privilege of printing a book; a privilege granted a manor or town."

It therefore appears that the lessees were given the option of operating a restaurant, soda fountain or beauty parlor as an incidental function to the operation of a drugstore. Since it was a privilege, the lessees were not obliged to operate a soda fountain, but at their option could do so or not as they chose. Hence there was no basis for a finding that defendants had breached the lease in this particular.

Third: *Did defendants permit the store to remain vacant and unoccupied without adequate stock and personnel?*

*No.* There is no evidence that defendants permitted the building to remain vacant or unoccupied at any time subsequent to the signing of the lease. On the contrary all the evidence discloses that the premises were occupied in a manner favorable to the operation of super drugstores in the county of Los Angeles. The testimony of Mr. Garfield was to the effect that the display of merchandise was well done; that the merchandise was adequate and the personnel was adequate.

■ Fourth. *Was there an implied covenant in the lease that defendants would during the term of the lease so conduct the business as to make it mutually profitable to both parties?*

*No.* In *Masciotra* v. *Harlow,* 105 Cal.App.2d 376, 379 [233 P.2d 586], plaintiff made the same contention, relying among others on *Selber Bros.* v. *Newstadt's Shoe Stores,* 194 La. 654 [194 So. 579] ; *Mayfair Operating Corp.* v. *Bessemer Properties,* 150 Fla. 132 [7 So.2d 342], and *Garden Suburbs etc. Club* v. *Pruitt,* 156 Fla. 825 [24 So.2d 898], in support of his claim that there was an implied covenant that the lessee, during the term of his lease, would so conduct his business as to make it mutually profitable to both parties. The court

there held (p. 379 [1 & 2]) that such a covenant would not be implied. A covenant that the lessee will, during the term of the lease, so conduct his business on the lessor's premises as to make it mutually profitable to both parties, it was held, would not be implied on a lease based on gross receipts and providing for a minimum monthly rental where the circumstances, as here, showed that the business to be created was a new venture, the probable revenue from which the parties had no way of estimating. Such decision is on all fours with the situation which existed in the instant case and is therefore controlling.

■ Fifth: *Was the trial court's award of $500 attorneys' fees inadequate?*

*No.* The trial judge had before him the knowledge of the services rendered by counsel in the present action, and it was his province to use his own experience in determining the reasonable value thereof. Having done so, in the absence of a showing of an abuse of discretion, his finding will not be disturbed on appeal. (*Clarke* v. *Angelus Memorial Assn.*, 14 Cal.App.2d 750, 752 [3] [58 P.2d 974], hearing denied by the Supreme Court.)

Affirmed.

Moore, P. J., and Fox, J., concurred.

A petition for a rehearing was denied March 17, 1955, and appellants' petition for a hearing by the Supreme Court was denied April 20, 1955.