A89A1915. PIGGLY WIGGLY SOUTHERN, INC. v. EASTGATE ASSOCIATES, LTD.
(392 SE2d 337)

POPE, Judge.

Piggly Wiggly Southern, Inc. (PWS) appeals from the grant of partial summary judgment to appellee Eastgate Associates, Ltd. (Eastgate). We granted this interlocutory appeal to consider whether the trial court decided properly the question of the measure of damages in this anticipatory breach of lease action. The pertinent facts are without dispute. Eastgate, a real estate developer, was developing a shopping center in LaGrange. The parties entered into an agreement in June 1986 by which PWS agreed to lease 38,000 square feet of space in the planned 65,000-foot development for a 20-year term. However, before construction of the shopping center began, the man-

agement of PWS changed. The new management decided not to operate a store in LaGrange and in February 1987 it notified Eastgate of its intent. Eastgate accepted the tender of breach and brought suit for breach and for specific performance. The trial court denied Eastgate's motion for summary judgment regarding specific performance as premature and granted partial summary judgment to Eastgate on the issue of damages while denying PWS's motion for summary judgment. In its order, the trial court held that Eastgate's damages were to be calculated from the time of breach until the expiration date of the lease and included "the excess of the rent stipulated in the lease contract over the reasonable value of the premises . . . reduced to present value." In addition, the trial court held that Eastgate was entitled to special damages pursuant to OCGA § 13-6-2 to include "the excess of rent which would have been paid to Eastgate by the other tenants in the shopping center over the reasonable rental value of the premises dedicated to other tenants . . . calculated from the time of the breach until the time the lease was to expire, reduced to present cash value . . . and . . . special expenses incurred by Eastgate at PWS's direction as a part of the contract or as a consequence of PWS's breach, less such benefits from such special expenses that have accrued or will accrue to Eastgate." *Held*:

We affirm in part and reverse in part. PWS argues that the measure of damages set by the trial court is improper because it is beyond the intention of the parties to the lease and includes elements that are too remote and speculative, namely lost profits from other shopping center tenants' leases and additional rent provided in the lease based on gross sales. Eastgate argues that PWS's status as the "anchor tenant" of the proposed shopping center, that is, the tenant with the largest space and the tenant that will draw customers in large numbers sufficient to create business for the "satellite tenants," must be recognized and that the trial court's order properly measures the damage flowing from the anticipatory breach of the lease by the "anchor tenant" PWS.

Resolution of this appeal requires several steps. We must first determine what the measure of damages is to a lessor for the lessee's anticipatory breach. PWS cites the case of *Szabo Assoc. v. Peachtree-Piedmont Assoc.*, 141 Ga. App. 654 (1) (234 SE2d 119) (1977) for the proposition that the proper measure is " 'the difference between the rental price agreed upon and the actual value of the premises at the time of the breach. . . .' " Id. at 655. However, a reading of *Strickland v. Flournoy*, 95 Ga. App. 315 (1) (97 SE2d 638) (1957), the case cited by the court in *Szabo* for the proposition, shows that the court in *Szabo* erred in stating the law. *Strickland* stands for the proposition that "[t]he measure of damages for the breach of a lease contract by the *lessor* is the difference between the rental price agreed upon

and the actual value of the premises at the time of the breach." (Emphasis supplied.) Accord *Kenny v. Collier*, 79 Ga. 743 (2) (8 SE 58) (1887). Thus, in discussing the hypothetical situation of an accepted tender of anticipatory breach (which was not present in that case), the court in *Szabo* mistakenly applied the rule applicable to *lessors* in an anticipatory breach situation to *lessees* who anticipatorily breach. Because the court was discussing a hypothetical, the statement was dicta. However, the statement is erroneous and should not be followed.

As a practical matter, we find that the generally accepted rule for the lessee's anticipatory breach to be virtually the same as that for the lessor's breach. As stated by the court in *Arthur Treacher's &c. v. Chillum Terrace*, 272 Md. 720 (327 A2d 282, 288) (1974), "the proper measure of damages to be applied [is] the excess of the rent reserved under the lease agreement over the reasonable rental value of the premises at the time of the breach. . . ." PWS argues that damages must be measured at the time of performance and not at the time of breach, citing *Phosphate Mining Co. v. Atlanta Oil &c. Co.*, 20 Ga. App. 660, 661 (93 SE 532) (1917). However, that case involves the sale of goods; we will follow the generally accepted rule for anticipatory breach of a lease by the lessee. See Annot., 85 ALR3d 514. Thus, we find that the trial court correctly stated the measure of damages flowing directly from the contract based on the agreed minimum rent.

Whether PWS may be liable for the loss of additional rent based on gross sales and for damages resulting from the loss of other tenants in the shopping center depends on whether PWS had an obligation of continuous operation during the term of the lease. Such an obligation may be express or implied. The lease in question contains no express provision requiring PWS to operate a business on the premises. Paragraph 10 of the lease states that "Lessee may use the leased property in any lawful manner." Paragraph 18 of the lease permits PWS to assign the lease. In determining whether a right of continuous operation may inure to the benefit of the lessor, the court in *Kroger Co. v. Bonny Corp.*, 134 Ga. App. 834 at 838-839 (216 SE2d 341) (1975), said "covenants would be implied only where the implication must arise from the language used or was indispensable to effectuate the intention of the parties, and that when the rental to be received under a lease is based on a percentage of the gross receipts of the business, with a substantial minimum, there is no implied covenant that the lessee will operate its business in the leased premises throughout the term of the lease." (Citations and punctuation omitted.)

Although the trial court did not expressly find that PWS had an implied obligation of continuous operation, it did so implicitly by finding that PWS was the "anchor tenant." In this, we find that the

trial court erred. The lease allowed PWS to use the premises in any lawful manner, was freely assignable and, in Paragraph 9 (d) (vii), PWS expressly disclaimed any representation or warranty as to the sales volume it expected to make in and from the premises. Under the factors set out in *Kroger v. Bonny*, supra, we find as a matter of law that PWS had no implied obligation of continuous operation. It follows that PWS has no liability for the lost profits to Eastgate from the other tenants. It also follows that PWS is not liable for damages based on percentage of sales, having disclaimed any projections in the lease contract.

Eastgate is allowed to seek those special damages that flow directly from PWS's breach — those "special expenses incurred by Eastgate at PWS's direction as a part of the contract or as a consequence of PWS's breach, less such benefits from such special expenses that have accrued or will accrue to Eastgate," as stated by the trial court. Although we reject PWS's argument that special damages (other than incidental damages) are *never* allowable, we must hold that under the terms of the contract made by the parties in this case, no further special damages are possible. Even though there is evidence that the parties intended that PWS would begin operation of its grocery business (e.g., the lease contained clauses dealing with permitted competition within the shopping center and specifications for construction of the space to accommodate the grocery business) and that PWS knew that its role as "anchor tenant" was critical to obtaining and keeping financing for the development and to attract other tenants to the shopping center, no obligation to begin operations exists in the lease contract, nor can one be implied. The two clauses discussed above allowing PWS to use the space for any lawful purpose and allowing PWS to freely assign the lease contract defeat the claim that PWS at least obligated itself to begin operating its business on the leased premises.

*Judgment affirmed in part and reversed in part. Banke, P. J., and Sognier, J., concur.*

DECIDED MARCH 16, 1990.

*Paul, Hastings, Janofsky & Walker, John G. Parker, Marshall D. Orson, Ronald T. Coleman, Jr.*, for appellant.

*Hurt, Richardson, Garner, Todd & Cadenhead, Robert L. Todd, James D. Comerford, Harold N. Hill, Jr.*, for appellee.